# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM D., A MINOR, BY AND THROUGH HIS PARENTS, DENNIS AND LUCY D., et al.<br><br>Plaintiffs<br><br>v.<br><br>MANHEIM TOWNSHIP SCHOOL DISTRICT<br><br>Defendant | CIVIL ACTION<br><br>No. 04-4535 |

Pollak, J.                                              September 27, 2007

## OPINION

In this action, plaintiffs William D. ("Billy"), an elementary school student with mild-range autism and speech language impairment, and his parents, Dennis and Lucy D., claim that defendant, Manheim Township (PA) School District ("the District"), wrongfully determined Billy to be ineligible for Extended School Year (ESY) services for the summer of 2004. Plaintiffs argue that, in making this determination, the District denied Billy the "free and appropriate public education" guaranteed by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482, through failure to comply with 22 Pa. Code § 14.132, a Pennsylvania regulation promulgated to ensure conformity with the IDEA. Plaintiffs accordingly seek compensatory education for Billy, as well as costs and

attorneys' fees.[1]

Prior to plaintiffs initiating this action, two levels of state administrative officers reviewed the District's ESY determination, as Pennsylvania regulations require.  *See* 22 Pa. Code § 14.162.  The District's determination was first affirmed by a Pennsylvania Special Education Hearing Officer ("Hearing Officer") and subsequently by a Special Education Due Process Appeals Panel ("Appeals Panel").  Plaintiffs now dispute the Appeals Panel's decision.

Pursuant to this court's order, *see* Docket # 14, plaintiffs and defendant introduced evidence in this court supplementing the administrative record.  Plaintiffs have now moved, and defendant has cross-moved, for judgment.  For the reasons that follow, plaintiffs' motion will be denied and defendant's cross-motion will be granted.

## I.  Background

### A.  Factual Background

Billy is a student with mild-range autism and speech-language impairment.[2]  During the 2002-2003 school year, Billy was enrolled in the District's half-day kindergarten and was provided with an array of special education services,

---

[1]Plaintiffs originally sought money damages but have since withdrawn that request.  *See* Docket # 21 at 6.

[2]This section draws from the administrative record (cited as "AR"). Where the facts are disputed or not identified in prior administrative findings, the record is cited.

including fifteen hours per week of in-home educational instruction through the
Lovaas Institute for Early Intervention, Inc. ("L.I.F.E. Inc.").  He performed well
in kindergarten, meeting the expectations for non-disabled students.  Some
members of Billy's Individualized Education Program (IEP) team believed that
Billy did not require ESY services in the summer of 2003.  AR 13 at SD 18.21.[3]
However, Billy's parents expressed the view that the summer between
kindergarten and first grade would be of particular importance to Billy's
development, and the District acceded to their request to provide ESY service for
that summer.  *Id.*  The District supported Billy's attendance that summer at a day
camp with a one-on-one aide and provided one hundred hours of in-home
educational instruction through L.I.F.E. Inc.

 The District placed Billy in a mainstream first grade class and his teacher,
Carol Miller, taught him the general education curriculum.  The District continued
to provide Billy with special education services.  Billy spent thirty-five to forty
minutes of each school day in his school's autistic support resource room, where
he focused on IEP goals that were not taught in the general curriculum.  The
District's autistic support teacher, Gerry Kaufhold, also spent twenty minutes per
school day with Billy during recess and ten to twenty minutes with Billy in the
regular classroom.  Billy also met three times a week with the school's speech and
language therapist, Jennifer Ridenour, in small group sessions.

---

[3]"SD" refers to the school district's exhibits submitted in the administrative proceedings.

Billy's IEP for first grade did not include private, in-home instruction, and this became a subject of dispute between the parties.  The dispute was resolved by an agreement under which the District–while reciting that it had no legal obligation, pursuant to the IDEA or otherwise, to do so–provided fifteen hours per week of in-home L.I.F.E. Inc. instruction for Billy.  Instructors from L.I.F.E. Inc. also collected observational data on Billy's classroom behavior every four to six weeks; the data were shared with Billy's IEP team.  Billy received the in-home instruction through the 2003-2004 school year, including weekends and vacations.

In first grade, Billy was socially successful compared with other first graders, AR 11 at NT 172,[4] was in the most advanced of four reading groups, and made the progress expected of non-disabled first graders in math and writing.  He also demonstrated average verbal fluency, *id.* at NT 180, an ability to follow verbal directions, *id.* at NT 178-79, and a willingness to ask questions when he did not understand directions.  *Id.* at NT 179.  Though he still made more grammatical errors than other students in conversation, his teacher, Ms. Miller, was confident that the errors did not impair his communication with others.  *Id.*  Overall, as of February 2004, Billy was found to be progressing well towards his annual educational goals.

Billy's IEP team met on February 23, 2004 to determine whether Billy should receive ESY services for the next summer.  The meeting was timed to

---

[4]"NT" refers to notes of testimony taken at the proceedings before the Hearing Officer.

conform with a Pennsylvania Department of Education (PDE) policy requiring that, for students with autism, IEP teams meet by February 28 of the school year to review whether the student will require ESY services.[5]  The IEP team determined that Billy would not require ESY services for the summer of 2004.  The team agreed, however, that Billy would require three 1.5 hour orientation sessions about one to two weeks prior to the start of the 2004-2005 school year to "preteach" skills for second grade.  His parents disagreed with the District's determination and did not sign the District's Notice of Recommended Educational Placement (NOREP).  The District requested a due process hearing pursuant to 22 Pa. Code § 14.162.

Proceedings were held before a Hearing Officer in March and April 2004.  At these proceedings, testimony was taken from the following members of Billy's IEP team: Billy's mother, Mr. Kaufhold, Ms. Miller, Ms. Ridenour, and Joyce Shopp, the District's Director of Pupil Services, who had substantial first-hand experience with Billy.  Testimony was also taken from Christine Smolar, Ms. Miller's aide, who, while not on Billy's IEP team, worked with Billy and collected observational data for the team.

---

[5]This policy is described in the PDE Guide to Extended School Year Services (April 1, 2003), included in the administrative record.  AR 14.  This policy requires that, if a student belongs to a "target group"–one of which consists of students with autism–the student's IEP team convene by February 28 of the school year to determine whether the student will require ESY services.  The PDE Guide also includes the text of the regulatory requirements for ESY, a summary of judicial authority for ESY services in Pennsylvania, and technical assistance documents such as an "ESY Checklist."

On April 16, 2004, the Hearing Officer affirmed the District's determination.  In a fourteen-page decision, the Hearing Officer made twenty-four findings of fact, citing the basis in the record for these findings.  Noting that the District followed the "ESY Checklist" contained in the PDE Guide to Extended School Year Services (April 1, 2003), AR 14, the Hearing Officer found that the District's  "recommendation regarding ESY is consistent with the provision of [free and appropriate public education]."  Decision of Hearing Officer (April 16, 2004), AR 8 at 13.  The Hearing Officer then concluded that "[b]ased upon the totality of the record, the District's decision regarding Billy's program without ESY [was] reasonably calculated to yield meaningful educational benefit."  *Id.*

On June 4, 2004, the Appeals Panel upheld the Hearing Officer's decision. The panel majority maintained that "the record fully supports the District's recommendation that the student does not need specific ESY programming over the summer."  Decision of Appeals Panel, AR 2 at 4.  The Appeals Panel found the Hearing Officer's opinion to be "well-reasoned and supported by the record.*"  Id.* at 4.  One member of the Appeals Panel dissented, stating that he would instead have ordered that a study be conducted during the first week of summer and that the IEP team then be reconvened to make a decision.  *Id.* at 5-6.

Plaintiffs then filed this suit challenging the Appeals Panel's affirmance of the Hearing Officer's ruling, and now seek compensatory education for defendant's denial of ESY services for the summer of 2004, plus attorneys' fees

and costs.  By permission of this court, *see* Docket # 14, plaintiffs submitted a

regression report of Billy's skills during a short break in his educational

programming.  Pl. Ex. I.  This court granted the District permission to supplement

the record with an analysis of the report's methodology.  Def. Ex. C.  Both parties

now move for judgment on the supplemented administrative record.


## II.  Statutory Framework

### A.  The IDEA

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.

§§ 1400-1482, requires that states receiving federal funding for public education

provide disabled children with a "free and appropriate public education"

("FAPE").  20 U.S.C. § 1412.  The "primary vehicle" for providing this right is the

Individualized Education Program (IEP), which is a statement written by an IEP

team setting forth annual goals for a disabled child's progress in the general

curriculum and in areas relating to the child's disability.  *S.H. v. State-Operated*

*Sch. Dist. of the City of Newark*, 336 F.3d 260, 264 (2003).  The IEP must confer a

"meaningful educational benefit" on the child, though not necessarily the

maximum possible benefit.  *Id.* at 271 ("The IDEA does not require the School

District to provide a Disabled Student with the best possible education.").

The IDEA sets out general standards for conducting an IEP; federal

regulations set forth the requirements that states must satisfy to meet these

7

standards.  Generally, the IDEA requires that states establish policies and

procedures to ensure that an IEP considers "the strengths of the child, the concerns

of the parent, and the most recent evaluation of the child."  *Id.* at 264

(summarizing 20 U.S.C. § 1414(d)(1)); *see* 20 U.S.C. § 1412(a) (requiring states to

have "in effect policies and procedures to ensure that . . . [a]n individualized

education program . . . is developed, reviewed, and revised for each child with a

disability in accordance with section 1414(d) of this title.").  More specifically,

however, the IDEA requires that states "must ensure that extended school year

services are available as necessary to provide FAPE..").  34 C.F.R. 300.106.  It

defines ESY services as "special education and related services that . . . [a]re

provided to a child with a disability--(i) Beyond the normal school year of the

public agency; (ii) In accordance with the child's IEP; and (iii) At no cost to the

parents of the child; and (2) Meet the standards of the [state educational agency]."

*Id.*

## B.  *The Pennsylvania ESY Regulation*

Pennsylvania regulations enumerate factors an IEP team must consider in

determining whether a disabled student is eligible for ESY services.  *See* 22 Pa.

Code § 14.132.  This regulation requires that "at each IEP meeting for a student

with disabilities, the school district shall determine whether the student is eligible

for ESY services and if so, make subsequent determinations about the services to

be provided."  22 Pa. Code § 14.132(1).  The regulation identifies seven factors

that an IEP team must consider in making this determination.  *See* 22 Pa. Code.

§ 14.132(2).[6]  Though this procedural requirement is strict, the regulation accords

the IEP team discretion to rely on a broad range of sources in considering the

seven mandatory factors.  *See* 22 Pa. Code. § 14.132(3).[7]

---

[6]The regulation provides that:

> (2) In considering whether a student is eligible for ESY services, the IEP team shall consider the following factors, however, no single factor will be considered determinative:
>> (i) Regression --whether the student reverts to a lower level of functioning as evidenced by a measurable decrease in skills or behaviors which occurs as a result of an interruption in educational programming.
>> (ii) Recoupment --whether the student has the capacity to recover the skills or behavior patterns in which regression occurred to a level demonstrated prior to the interruption of educational programming.
>> (iii) Whether the student's difficulties with regression and recoupment make it unlikely that the student will maintain the skills and behaviors relevant to IEP goals and objectives.
>> (iv) The extent to which the student has mastered and consolidated an important skill or behavior at the point when educational programming would be interrupted.
>> (v) The extent to which a skill or behavior is particularly crucial for the student to meet the IEP goals of self-sufficiency and independence from caretakers.
>> (vi) The extent to which successive interruptions in educational programming result in a student's withdrawal from the learning process.
>> (vii) Whether the student's disability is severe, such as autism/pervasive developmental disorder, serious emotional disturbance, severe mental retardation, degenerative impairments with mental involvement and severe multiple disabilities.

22 Pa. Code. 14.132(2).

[7]The regulation provides that:

> (3) Reliable sources of information regarding a student's educational needs, propensity to progress, recoupment potential and year-to-year progress may include the following:
>> (i) Progress on goals in consecutive IEPs.

9

This court has jurisdiction over claims arising under § 14.132.  The regulation was implemented to fulfill the state's obligations under the IDEA.  *See* 30 Pa. Bull. 4628 (September 2, 2000) (stating that the purpose of the regulation is to align Chapter 14 of the Pennsylvania Code with the IDEA, as amended June 4, 1997, and related federal regulations).  This court need not determine whether the regulation asks more of school districts than required by the federal statute, since, under the IDEA, "federal law incorporates state standards, and a school district may violate the IDEA if it fails to satisfy the more stringent state law requirements."  *Stephen C. v. Radnor Tp. Sch. Dist.* 202 F.3d 642, 647 (3d Cir. 2000) (internal quotation omitted), *cert. denied,* 531 U.S. 813 (2000).[8]

---

           (ii) Progress reports maintained by educators, therapists and others having direct contact with the student before and after interruptions in the education program.
           (iii) Reports by parents of negative changes in adaptive behaviors or in other skill areas.
           (iv) Medical or other agency reports indicating degenerative-type difficulties, which become exacerbated during breaks in educational services.
           (v) Observations and opinions by educators, parents and others.
           (vi) Results of tests including criterion-referenced tests, curriculum-based assessments, ecological life skills assessments and other equivalent measures.

22. Pa. Code § 14.132(3).

   [8]*But cf.* the Second Circuit's recent decision in *Bay Shore Union Free School Dist. v. Kain,* 485 F.3d 730 (2d Cir. 2007), which held that a state regulation passed to comply with the IDEA, but imposing stricter obligations on school districts than required by the IDEA, did not provide a basis for federal question jurisdiction.

### C.  Standard of Review

The parties move for judgment on the supplemented administrative record. In reviewing the Appeals Panel's and Hearing Officer's conclusions, the court "base[s] its decision on the preponderance of evidence" in the supplemented record.  20 U.S.C. § 1415(i)(2)(C)(iii).[9]  This means that it "must give due weight to the administrative proceedings (so as not to impose the court's own view of preferable educational policy on the states), but the court is free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act."  *Oberti v. Clementon Sch. Dist*, 995 F.2d 1204 (3d Cir. 1993) (citing *Bd. of Educ. of Hendrick v. Rowley*, 458 U.S. 176 (1982)).  This standard "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  *Rowley*, 458 U.S. 176 at 206; *see S.H.*, 336 F.3d at 270 (citing *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir.1995)).  If a court rejects the Hearing Officer's and Appeals Panel's findings  it "is obliged to explain why."  *S.H.*, 336 F.3d at 270.

---

[9]After the complaint in this case was filed, the Supreme Court held that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief."  *Schaffer v. Weast* , 546 U.S. 49, 62, 126 S.Ct. 528, 537 (U.S. 2005).  In the case at bar, the court finds that, at the administrative hearings, the District established by a preponderance of evidence that the District provided Billy with a free and appropriate public education, and that plaintiffs' after-acquired evidence does not alter this determination.

### III. Discussion

Plaintiffs contend that the District denied Billy a free and appropriate public education both by failing to comply with the procedural requirements of 22 Pa. Code § 14.132 and, as a substantive matter, by issuing an IEP that does not provide Billy with ESY services.  With respect to their procedural contention, plaintiffs argue that: (a) the District failed to consider all seven mandatory § 14.132 factors in making its ESY determination and (b) the District's decision was not based on appropriate evidence.  With respect to their substantive contention, plaintiffs argue that the Hearing Officer's determination is contradicted by the preponderance of evidence in the administrative record and that their new evidence further weighs against the Hearing Officer's determination.

When evaluating whether the District denied Billy a free and appropriate public education, "the court must make a twofold inquiry: first, whether the state has complied with the procedures set forth in the Act, and second, whether the individualized educational program ('IEP') developed pursuant to these procedures is 'reasonably calculated to enable a child to receive educational benefits.'" *Fuhrmann v. East Hanover Bd. of* Educ., 993 F.2d 1031, 1034 (3d Cir. 1993) (quoting *Rowley,* 476 U.S. 176 at 206-07).  Thus, the court must first address plaintiffs' procedural arguments.

### A.  The Mandatory Factors Under § 14.132

The Pennsylvania Code provides that "[i]n considering whether a student is eligible for ESY services, the IEP team shall consider" seven factors.  22 Pa. Code § 14.132(1).  Plaintiffs argue that the District violated this mandatory requirement by failing to consider the seventh of these factors: "[w]hether the student's disability is severe, such as autism . . . ."  22 Pa. Code § 14.132(2)(vii).  Plaintiffs direct the court to Ms. Shopp's testimony that "the area of disability is . . . quite irrelevant to the question" of whether a student is eligible for ESY services, AR 11 at NT 149, as well as to Billy's IEP team meeting summary, AR 13 at SD 20.4, which does not indicate that Billy's diagnosis was discussed as a factor in favor of granting him ESY services.

Plaintiffs' argument relies on an awkward and limiting interpretation of the regulation.  Plaintiffs are correct that, according to the record, the IEP team likely did not articulate that Billy's diagnosis of autism weighed in favor of providing him with ESY services.  However, the record also demonstrates that all members of the IEP team were aware of Billy's autism and oriented their deliberation toward addressing his disability.[10]  As Ms. Shopp observed, "it is self-evident from reading the documents that Billy is a child whose disability under the IDEA is

---

[10]In fact, the meeting's scheduling reflects the IEP team's awareness of Billy's disability. As addressed above, *see* text accompanying footnote 5, PDE policy requires that IEP teams for students with autism meet before February 28 of the school year to determine whether the student will require ESY services.  *See* AR 11 at NT 148.

13

autism." AR 11 at NT 148.  Moreover, the testimony of other IEP team members demonstrates that they were aware of Billy's autism and made their decisions in light of the challenges he faces as a student with that disability.  *See* AR 9-12.

Thus, plaintiffs' argument is only compelling if, in requiring the IEP team to "consider" the severity of a student's disability, the regulation requires that the team formally and explicitly deliberate over the taxonomy of the student's diagnosis.  This interpretation would betray the sensible understanding of "consider."  The Oxford English Dictionary defines "consider," in its transitive form, as follows: "to contemplate mentally, fix the mind upon; to think over, meditate or reflect on, bestow attentive thought upon, give heed to, take note of." Oxford English Dictionary Online (2nd ed. 1989).  This definition does not suggest that an object of consideration must be articulated and actively discussed.  One may "consider" a factor relevant to a decision by bearing it in mind and allowing it to inform and shape one's reflections on a matter.

This definition does not strip § 14.132's "severity" factor of significance. Though her ultimate determination was warranted, the Hearing Officer was inaccurate in stating that "[t]he state ESY regulation . . .  does not suggest that all students with autism have severe disabilities."  AR 8 at 6.  The regulation plainly includes autism as an example of a severe disability in providing that: "[T]he IEP team shall consider . . . [w]hether the student's disability is severe, such as autism . . . ."  22 Pa. Code § 14.132(2)(vii).  This language is not a relic from a vanished

14

era when "autism" carried a meaning radically different from today's meaning. Prior to § 14.132, an identical provision, § 342.34, was added to the Pennsylvania Code on February 21, 1998. *See* 28 Pa. Bull. 1002. The Department of Education initially proposed that this provision track the language of the prior regulation, 22 Pa. Code. § 14.34 , which provided only that, when considering ESY eligibility, an IEP team "shall pay particular attention to students with disabilities that are thought of as severe . . . ." 27 Pa. Bull. 2423 (May 17, 1997). The Pennsylvania Independent Regulatory Review Commission and "at least one public commentator" urged more precision, and, borrowing examples from federal case law, "specific examples of disabilities thought of as severe were added to subsection (c) . . . ." 28 Pa. Bull. 1002. This language was incorporated into the present regulation on June 9, 2001 and, when it was submitted for public comment, no one suggested that it be altered (though comments were provided on other provisions in Chapter 14 at that time). *See* 31 Pa. Bull. 3021. Thus, the regulation's language and history make clear that, if a student has autism, no matter how mild, the student's IEP team must be cognizant of the disability and make its ESY determination with regard to the challenges that the condition poses.

This is precisely what the IEP team did with respect to Billy's autism. The record clearly demonstrates that the professionals on Billy's IEP team were aware that Billy has mild autism and that their care, observation, and education of Billy were oriented toward the challenges he faces as a student with that disability. For

15

example, in addition to Ms. Shopp's testimony, Mr. Kaufhold, as the District's research autistic support teacher, AR 10 at NT 345, testified about his work helping Billy overcome social cognition deficits that children with autism are susceptible to developing. *Id.* at NT 357-60. Furthermore, Billy's teacher, Ms. Miller, testified that she participated in the IEP team's decision to continue providing Billy with special education services that are relevant to his disability during the school year. AR 11 at NT 202. It is apparent, therefore, that the nature of Billy's disability was a background reason that shaped the IEP team's discussion of Billy's needs, and that his IEP was tailored to assure that the District provided him with a free and appropriate public education in light of his autism.

Plaintiffs also argue that the District failed to consider "the extent to which a skill or behavior is particularly crucial for the student to meet the IEP goals of self-sufficiency and independence from caretakers." § 14.132(2)(v). Though the Hearing Officer did not squarely address this issue, plaintiffs' argument is unsupported by the record. Billy's ESY determination worksheet, though marking "n/a" in the column addressing self-sufficiency, indicates that "Billy functions independently in all basic life skills. His IEP contains no goals/objectives related to self-sufficiency. He has demonstrated independence in self-sufficiency prior to the onset of school age services." AR 13 at SD 20.5-20.6. Thus, the IEP team expressly considered this factor.

B. *Adequate Sources of Reliable Information Under § 14.132*

§ 14.132(2) requires the IEP team to consider whether, when formal

education is interrupted, "the student reverts to a lower level of functioning"

("regression"), "whether the student has the capacity to recover the skills or

behavior patterns in which regression occurred" ("recoupment"), and "[w]hether

the student's difficulties with regression and recoupment make it unlikely that the

student will maintain the skills and behaviors relevant to IEP goals and

objectives." § 14.132(2)(i)-(iii).  Plaintiffs argue that the District's failure to

collect formal regression/recoupment data during Billy's weekends and vacations

"resulted in the inability of the IEP team to consider" these factors.  The Hearing

Officer found that there had been no opportunity to collect such data because, at

the parents' request and due to their efforts, there had been no break in Billy's in-

home instruction prior to the hearing.[11]  Nonetheless, the Hearing Officer found

that there was "sufficient information . . . in the record regarding

regression/recoupment . . . to support the ESY IEP team's conclusion."  AR 8 at

13.

§ 14.132(3) offers a non-comprehensive list of "[r]eliable sources of

_____

[11]The parties argue at length about who bears the fault for the District's failure to
collect regression/recoupment data.  Though the court defers to the Hearing Officer's
credibility determination that, based on Ms. Shopp's testimony, the parents bear fault,
*see Carlisle Area Sch. Dist. v. Scott P.*, 62 F.3d 520 (3d Cir. 1995), *cert. denied*, 517 U.S.
1135 (1996), the issue is irrelevant to whether the District actually made their ESY
determination on appropriate data.

information regarding a student's educational needs, propensity to progress, recoupment potential and year-to-year progress." These include "[p]rogress on goals in consecutive IEPs . . . [,] [o]bservations and opinions by educators, parents and others . . . [and] [r]esults of tests including criterion-referenced tests, curriculum-based assessments, ecological life skills assessments and other equivalent measures." 22 Pa. Code § 14.132(3). This court has previously noted that the absence of a formalized data collection process does not render the record incomplete. *See* Docket # 14 at 8 n. 5. The Hearing Officer concluded that Billy would not face significant regression or recoupment difficulties based in part on Billy's progress in consecutive IEPs, explaining that a repeated goal from year-to-year may still indicate substantial progress, as well as strong observational data supplied by teachers, instructors, and aides. These are "reliable sources of information" under § 14.132, and the Hearing Officer correctly determined that they supported the District's determination.

Finally, plaintiffs argue that in determining that Billy's autism is in the mild range, the District and the administrative officers improperly relied on a diagnosis from October 2001. Plaintiffs do not assert, and present no evidence, that this diagnosis is inaccurate, and they point to no authority requiring the District to rely on a more recent diagnosis. This court finds that the Hearing Officer relied on proper and reliable sources in affirming the District's determination that Billy has mild-range autism.

18

Thus, the court concludes that the District fulfilled the procedural requirements of 22 Pa. Code § 14.132.  The District considered all required factors in determining that Billy did not require ESY services.  Because the District considered these seven factors on the basis of appropriate and reliable information, it satisfied its obligations under § 14.132.

### C.  The Hearing Officer's Findings

Plaintiffs also contend that, regardless of whether the District complied with § 14.132, the District denied Billy a free and appropriate public education by denying him ESY services.  In evaluating this claim, the court asks whether "the individualized education program ("IEP") . . . [is]  reasonably calculated to enable the child to receive educational benefits."  *Fuhrmann*, 993 F.2d at 1034 (*quoting Rowley,* 476 U.S. 176 at 206-07).  In order to satisfy this substantive requirement, the District's IEP for Billy must provide "more than *de minimis*" educational benefit to him.  *Polk v. Central Susquehanna Int. Unit* 16,  853 F.2d 171, 182 (3d Cir. 1988), *cert. denied*, 488 U.S. 1030 (1989).

Plaintiffs first argue that the Hearing Officer erred based on the record before her.  In support of this argument, plaintiffs point to a number of elements of the administrative record that could weigh against the Hearing Officer's decision.  However, the Hearing Officer considered many of these elements and accurately determined that, based on countervailing evidence, they did not warrant judgment

19

in plaintiffs' favor.

Plaintiffs claim that Billy's IEPs, tests, and progress reports indicate that Billy did not make meaningful progress on his goals relating to generative expressive language and social cognition, goals with which he struggled in kindergarten. The Hearing Officer rejected these assertions, concluding that, according to credible testimony, tests, and reports, Billy was making substantial progress on these goals. Though plaintiffs point to Billy's quarterly progress reports to indicate that he was not on track to reach his IEP goals, the Hearing Officer addressed this evidence and found it unavailing in light of the large body of countering evidence, including standardized testing and observational reports from Billy's L.I.F.E. Inc. consultants. *See* AR 8 at 5. The Hearing Officer also cited testimony confirming that the threshold for satisfying these goals is raised as a student advances in age, so that a student may progress in absolute terms while still working on the same goal, with the same level of reported success, over multiple years. *Id.* at 7. The Hearing Officer thus concluded that "there is no evidence to suggest that [Billy's] skills have stagnated; to the contrary except for some very limited circumstances, he is making the kind of progress to achieve above average levels within the regular first grade curriculum." *Id.* at 14. The court finds no error in this determination.

Plaintiffs argue that the Hearing Officer should not have placed weight on some of Billy's progress reports because the teacher's aide collecting a portion of

the data on Billy in large group settings "had not received any training regarding data collection as required by federal law." Pl. Br. 15. Plaintiffs rely on 34 C.F.R. § 300.156(f), which provides that "paraprofessionals must be appropriately trained and supervised . . . to assist in the provision of special education and related services." Though plaintiffs' argument relies on a rather forced interpretation of this regulation, the court need not address it, as the record shows that the aide, Ms. Smolar, in fact received data collection training, albeit not specifically for observation of Billy. *See* AR 11 at NT 247. Moreover, the record confirms that Ms. Smolar received training in autism and behavior management. *See id.* at 227.

Plaintiffs also argue that the Hearing Officer improperly ignored testimony that neither Billy's mother nor his home-based behavioral consultant through L.I.F.E. Inc., Kim Callan, were asked for their opinions regarding Billy's regression or recoupment at the February 2004 IEP meeting. AR 10 at NT 468-69. While the Hearing Officer did not specifically address this issue, the court finds that it is immaterial. The record demonstrates that the parents and Ms. Callan had the opportunity to offer their views on regression and recoupment in the meeting. While Billy's mother testified that she was not asked about Billy's regression and recoupment challenges, the summary of the IEP team meeting shows that Billy's parents fully participated in the deliberative process, voicing their concerns about other factors of the eligibility review, including whether the data were sufficient to assess Billy's progress. AR 13 at SD-20.4. Additionally, though Billy's mother

testified that she did not recall whether Ms. Callan was asked about regression or recoupment at the IEP team meeting, she further testified that Ms. Callan did talk about her views on these issues at the meeting.  AR 10 at NT 469.

Plaintiffs further argue that the Hearing Officer disregarded testimony from Billy's mother regarding his functioning within the community.  However, the Hearing Officer found that, notwithstanding the parents' observations while they observed Billy in the classroom or participating in social events, the record supports the District's determination that Billy was making adequate progress toward meeting this goal.  *See* AR 8 at 14.  This determination is supported by the record, which includes testimony from IEP members indicating that they considered the parents' input on these issues, but ultimately found it unpersuasive.  *See,* AR 11 at 142, 152, and 159; AR 10 at 422.  The court finds that the Hearing Officer's factual determinations were supported by the preponderance of evidence in the record before her.

### *D. Plaintiffs' After-Acquired Evidence*

Finally, plaintiffs argue that the District's determination is proved wrong by their after-acquired evidence, a regression study from June 2004.  Pl. Ex. I.  In evaluating this argument, "the adequacy of a student's placement can only be determined as of the time it is offered to the student, and not at some later date." *Fuhrmann,* 993 F.2d at 1040.  The court therefore cautioned plaintiffs that it would only deem the report relevant insofar as it sheds light on the District's decision at

the time it was made.  *See* Docket # 14 at 9.

The study was conducted by Kim Callan, the behavioral consultant from L.I.F.E. Inc., who had worked with Billy for many years.  Over a twelve-day period, Billy's formal one-to-one instruction was stopped.  His skills were tested and observed at the beginning of a twelve-day period (the baseline measurement) and again at the end (the post-assessment measurement).  The "percentage [point] difference" in Billy's performances was measured to quantify his regression.  The report also asserts that, as of July 20, 2004, Billy had not recouped skills; no data were provided to support this claim.

The District submitted an analysis of Ms. Callan's report.  Def. Ex. C.  In this analysis, the District's expert, Joyce Shopp, questioned Ms. Callan's credentials to conduct a formal regression study.  Ms. Shopp also criticized the report's lack of clarity and identifies many apparent problems with Ms. Callan's testing methodologies and interpretations of Billy's results.[12]

Although Ms. Callan's report contains multiple tests of Billy's language, grammar and social abilities, the report does not adequately explain her testing methodologies or provide examples of the tests she performed so that their

---

[12]Ms. Shopp also asserted that, at a February 15, 2005 IEP meeting, the parents explained that, during the study, they left Billy's days unstructured and permitted him to "do what he wanted to do."  In doing so, Ms. Shopp appears to have offered personal testimony based on her personal knowledge of events occurring in February 2005, rather than her expert opinion of the Callan report.  The court disregards this aspect of Ms. Shopp's analysis as unrelated to the purposes for which the District was permitted to submit evidence: to provide opinion evidence analyzing Ms. Callan's methodologies and credentials.

reliability might be accurately evaluated.  Ms. Shopp's analysis noted that, without examples of the tests of Billy's language and grammar with respect to Objectives 1 and 2 (both pertaining to appropriately answering "wh" questions), it cannot be determined whether Ms. Callan asked appropriate questions, or that the baseline measurement questions were as difficult as the post-assessment measurement questions.  *See* Def. Ex. C at 3.  Ms Shopp's analysis also identified a range of potential problems with how the tests were administered and how the results were interpreted.  For example, Ms. Shopp observed that, being untrained in speech and language pathology, Ms. Callan may have marked correct responses as errors with respect to tests on Objective 1.  *See id.* at 3.  Ms. Shopp also drew attention to a range of other uncertainties regarding Ms. Callan's expertise and methods, all of which cast substantial doubt on the reliability of the regression report.

Even if Ms. Callan's tests were assumed accurate, however, they do not offer a quantitative measure of Billy's recoupment.  While the Callan report states that skills other than asking questions had not been recouped as of July 2004, it provides no data to support this claim.  Thus, at best, the report casts doubt on only one of the seven mandatory § 14.132 factors, regression, that the IEP team considered in denying Billy ESY services.  The Hearing Officer made her finding on this regression factor based on reliable and appropriate evidence.  This earlier evidence included reports, tests, and observations that were available to the IEP team as they were making their ESY determination, as well as testimony from IEP

24

team members.  The court thus finds the earlier evidence to be more probative than the Callan report as to whether the District's determination was soundly based at the time it was made.  Since this is the relevant inquiry for the court, it finds, on the basis of the administrative record as supplemented by the further evidence presented to the court, that (a) the District provided Billy with a free and appropriate public education, (b) the District's decision that Billy did not require ESY services in the summer of 2004 was supported by the record before the District, and (c) the absence of ESY services for Billy in the summer of 2004 was not incompatible with the District's obligation to provide Billy with a free and appropriate public education.

## IV.

For the foregoing reasons, plaintiffs' motion for judgment will be denied and the District's cross-motion will be granted.  An appropriate order accompanies this opinion.

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM D., A MINOR, BY AND THROUGH HIS PARENTS, DENNIS AND LUCY D., et al.<br><br>Plaintiffs<br><br>v.<br><br>MANHEIM TOWNSHIP SCHOOL DISTRICT<br><br>Defendant | CIVIL ACTION<br><br>No. 04-4535 |

## ORDER

September 27, 2007

    For the reasons stated in the accompanying opinion, it is hereby ORDERED as follows:

    (1) Plaintiffs' motion for judgment on the supplemented administrative record (Docket # 21) is DENIED.

    (2)  Defendant's motion for judgment on the supplemented administrative record (Docket # 22) is GRANTED.

———————

/s/ Pollak, J.
